# KENTUCKY COURT OF APPEALS

W. H. BEAZLEY v. A. J. MERSHON ET AL.

**Pleadings—Re-opening of Former Adjudications of Same Subject.**

After answer and proof, on a petition filed by the plaintiff to try a cause of action reversed on a former appeal, if the special causes set forth, be not sustained, the court could not go behind the former adjudication to retry the questions then presented and involved in the record.

**Judicial Sale of Land Under Attachment—Fraud or Collusion Charged.**

A judicial sale of land, under an attachment proceeding against a then non-resident, will not be set aside in the absence of fraud and collusion, even though a former judgment in the same proceedings had been reversed for lack of proper service.

**Bill of Rights—Duty of Debtor to Discharge Debts—Arbitrary Power.**

It is not deemed absolute, arbitrary power to compel a debtor to pay what he owes, however efficient or speedy the remedy may be, these being considered as sustaining the obligation of the contract.

**Same—Debtor and Creditor—Delays in Payment of Debt.**

All delays after debts are due are regarded as matters of grace on the part of the creditor or the government, especially when regulated by law.

**Rights of Citizens—Wrongful Taking of Property.**

To take from a citizen his property without just compensation paid or to be paid, may be justly denounced as absolute, arbitrary power, within the constitutional meaning, but not so where he is merely compelled by legal process to pay out of his property moneys he may owe to others.

**Attachment—Constitutional Construction.**

An attachment, authorized by a legislative enactment, is not invalid, which seeks to subject a citizen's property, by reason of his violation of its provisions, and is not in conflict with the constitutional provision, declaring "absolute, arbitrary power over the lives and property of freeman exists nowhere in a republic, not even in the largest majority."

**Attachment—Proceedings Under Legislative Enactment—Right of Debtor to Attack.**

Though an attachment be authorized and is instituted under an act of the legislature, it does not prevent the debtor from showing the irregularities in the issual of the attachments, particularly those that would vitiate them.

3

---

Opinion of the Court.

---

Appearance—To Attachment Suit.

The appearance to a suit in attachment, removes the necessity of taking refunding bonds as required by the Civil Code as against a defendant constructively summoned, as the creditors could proceed to obtain judgments in personam.

Same.

This would not preclude the defendant, by proper proceeding, from defeating the attachment in whole or in part, for any legal cause existing previous to such appearance.

Process—Constructive Appearance.

However defective may be the warning orders in an attachment suit against a non-resident, his appeal to the Appellate Court, is constructive service, and equivalent to an actual service at the filing of the mandate in the lower court.

Judgments—Reversal by Appellate Court.

After a judgment in rem has been reversed, in an attachment suit, on constructive service, and no judgment in personam rendered on appearance in the court below, it is error for the court to treat said judgment as against the defendant, and allow a judgment over for the excess received by the creditors.

Same.

The court should ascertain the amount owing each creditor, to be cancelled out of funds received by each, and order a return into court of the surplus.

Same—Debtor and Creditor—Right of Action for Wrongful Attachment.

The debtor is thus entitled to an action of damages against such creditors for any sacrifice unnecessarily caused him by such wrongful attachment.

Executors and Administrators—Creditors Right of Action Against.

A judgment should not be rendered against an administrator in an attachment proceeding, until the creditors shall manifest, in proper form, their claims against the decedent's estate, for the heirs and distributees are the substantial parties to be affected.

Same.

The creditors are not relieved of this necessity even though their claims be against an absconding administrator, proceeded against by attachment.

Same.

Without a personal judgment against an administrator, nor against him in his fiducial capacity, in an attachment suit, his individual means can-

not be converted to the payment of debts of the attaching creditors of the intestate.

**Judgments—Motion to Dismiss Proceedings on Reversal of Cause.**

Where a judgment has been reversed, and on trial of the consolidated cause in the court below, the dismissal of a motion of the plaintiff to strike out the attachment proceeding of the creditors whose judgments were thus reversed, cannot prejudice the plaintiff's rights, as upon such dismissal, the court could not revive the reversed judgments.

APPEAL FROM GARRARD CIRCUIT COURT.

January 9, 1869.

OPINION OF THE COURT BY JUDGE WILLIAMS:

*Various creditors of appellant obtained attachments against his estate in the year 1862 upon the alleged ground of his being in the "Confederate" military service, being voluntarily within the "Confederate" military lines, and also of having carried out of this State a material portion of his property, not leaving a sufficiency to pay his debts. August 27, 1863, upon constructive service of process, judgment was rendered ascertaining the amount of each creditor's claim and ordering a sale of the attached property.

And the commissioner therein appointed proceeded, September 28, 1863, county court day, to make the sale, when appellee Mershon became the purchaser of the farm of 267 acres for $5,767.20. Robert Ray purchased a negro slave man at $225. Richard Hackley a negro slave woman at $306, and William Sellers purchased the house and lot in the town of Lancaster at $320, and gave notes as required by the judgment.

Mershon desiring to pay the first note, by consent of the attaching creditors, the commissioner received the money soon after its execution.

Beazley prosecuted an appeal to this court from said judgment, which was reversed at its December term, 1864, and remanded for further proceedings, and which this court adjudged to be a constructive appearance.

Beazley still not having actually returned to Kentucky when

*See Vol. 1, Ky. Opinions, p. 128.

the mandate of this court was entered in the lower court at its March term, 1865, Mrs. Beazley offered to file an amended answer, which the court rejected, and confirmed the sale and distribution the same day.

At the succeeding September term the appellant made his actual appearance and petitioned for leave to answer, averring that he had not left the State voluntarily, but was compelled to do so to save his life; that he had left more than a sufficiency of property to pay his debts; that he did not owe some of the named attaching creditors anything, and others not as much as claimed; and that his property had been sold and sacrificed by fraudulent combinations; whereupon the court suspended the judgment of the previous term, and gave defendant leave to file his answer within sixty days.

In the meantime, another appeal had been prosecuted from the judgment of the March term, 1865, and which was affirmed by this court soon after his appearance at the September term, 1865, of the lower court, so far as the Mershon purchase was concerned, that appearing to be the only asserted cause of appeal.

At the succeeding term of the lower court Beazley offered to file his answer substantially setting out the defenses appearing in his petition and affidavit filed the previous September, which the court rejected, and set aside the order suspending the judgment of the spring term, 1865, from which Beazley again appealed to this court, which, April 19, 1867, reversed the judgment of sale. 1 Bush, 466.

This court then held that the first reversal on Beazley's appeal changed the proceedings from those *in rem* to those *in personam,* because of his constructive appearance, and that the judgment of sale being reversed, there was no judgment in the case, and could properly be none until a personal judgment was also rendered, and that the affirmance by this court before the expiration of the sixty days granted Beazley by the lower court, at its September term, 1865, did not preclude him from making such defense; this court then said:

> "It opened the whole case, *except as to the sale,* and opened it for litigation *in personam,* instead of *in rem,* and should the appellant finally succeed in quashing the attachments, or defeating the claims of any of the creditors to any extent, *the sale standing,* his remedy for reparation

*pro tanto* may be on the bonds of the defeated appellees."

Before this, February 13, 1866, Beazley filed an original petition in Equity, in the lower court, giving a history of the several attachments, denying he had voluntarily left the State or removed his property therefrom, not leaving a sufficiency to pay his debts, or that he was voluntarily within the Confederate military lines; denying that he owed some of the debts, and the full amount as asserted by other creditors; denying the right of those who had debts upon his deceased brother, whose administrator he was, to attach his personal and individual property for the same, and charging a fraudulent combination on the part of the attaching creditors and the purchasers to sell and sacrifice his property, making both the attaching creditors and the purchasers parties.

Issues were made by the defendants, and evidence taken by both parties, and March 5, 1868, judgment was rendered by the court, which dismissed all the motions of Beazley to dismiss the several attachments; also, all his motions to set aside and vacate the sales to Mershon and Sellers, and sustained and perpetuated Mershon's injunction to stay Beazley from committing waste, and dissolved Beazley's injunction against Mershon from proceeding under his previous order of possession to turn him out and take possession of said farm; and some other things not now necessary to recite. Beazley now prosecutes an appeal to reverse this judgment.

The court having dissolved the injunction of Beazley obtained upon his petition, on mere motion, without answer or proof, one of the judges of this court very properly reinstated the same, holding that the allegations of the petition presumptively made a case not before adjudicated, and therefore he was not concluded by the former adjudications from making out the causes herein set out. But, after answer and proof, if the special causes herein set out are not sustained, of course this court could not go behind the former adjudications to retry the questions which were then presented and involved in the record, and which were, or should have been, considered and adjudicated.

So far as any imputed fraud to Mershon it set up, it is not only unsustained by Beazley's evidence, but may be regarded as repelled by Mershon's.

Though Brown and Perkins thought the general opinion was

that Mershon was purchasing for Beazley, neither state any facts from which it appears that Mershon had by any act or conduct made such impression, or even knew that such was the case.

Nor could the statements of Saddler affect Mershon, even if these were uncontradicted, because, it is not shown that he knew what had happened between Dunn and Saddler, and especially can he not when Dunn as positively denies that. any such conversation occurred as Saddler states that it did.

As there is, therefore, nothing in this case to sustain the charge of combination and fraud as to Mershon, and as both the policy of the Civil Code and the common law, including our equity jurisprudence, is to sustain judicial sales, and Mershon's right to hold said land has heretofore been adjudicated, the judgment was essentially and appropriately right, as to him. He having paid the purchase price and received the deed, his case comes precisely within the provision of section 448 Civil Code, which declares that:

> "the title of purchasers in good faith to any property sold under *attachment* or *judgment,* shall not be affected by the new trial permitted by section 445, except the title of property obtained by. the plaintiff and not bought of him in good faith by others."

This is one of many sections of Chapter 1, Title 10, to regulate actions against absent and non-resident defendants, and which embraces the proceedings under which Beazley's land was sold. Besides, Beazley does not even offer or tender back to Mershon the money he bid and paid for the land.

This court has rarely, if ever, set aside a judicial sale to an innocent purchaser after the payment of the purchase money and obtaining the title by deed. Sellers has also paid for the house and lot purchased by him, and received his deed, and he also being an innocent purchaser must be protected in his purchase.

Whether or not the original attachment suits are yet pending seems somewhat uncertain, but as all the attaching creditors are made defendants to this suit, and causes and defenses against the attachments are assigned and issues made thereon, it may be presumed they have stopped at the point when last reversed, and as it is *exceedingly desirable* to end this multifarious and rather novel litigation by our judgment, we will examine the still pending

causes of litigation, rather such as has not been closed by previous adjudication.

Beazley nowhere denies that he was a soldier in the Confederate army, and if he had, it is abundantly established; he denies that he voluntarily left his home, because he says he had to flee to save his life; however this might be, a response to the allegations of his being voluntarily within the military lines of the Confederacy, it is no response to his having joined its military service. By an act of December 23, 1861, the grounds for an attachment were enlarged so as to authorize its issual against a

> "defendant or defendants who are in the service of the army of the so-called Confederate States of America, or any military body of men co-operating with said army."

The next section authorizes an attachment when the defendant "have *voluntarily* left the county of his or their residence" for thirty days, and continued *"voluntarily* within the Confederacy or their military lines." This use of the word *voluntary* in the second section shows it was not left out of the first by oversight, but manifests the clear intendment of the legislature to make the entering the military service of the Confederacy a cause of attachment. What might be the rational construction in a case where it is made to appear that the defendant was compelled by superior force so to enter the service and fled from it on the first available opportunity, we need not say, because there is neither averment nor proof of such in this case, and, even if it be conceded that such a system of persecution had been kept up against appellant, for ten months after the violent death of his brother, as to indicate his total insecurity at home, still there is nothing to show that it was necessary for his protection to go into the military service of the enemy.

But this provision of the enactment is assailed for want of constitutional validity, because, in the Bill of Rights in our State Constitution it is declared that "absolute, arbitrary power over the lives and property of freemen exists nowhere in a republic, not even in the largest majority." But to make a debtor pay what he owes has never been deemed *absolute, arbitrary power;* therefore, the imprisonment of the debtor himself until he paid the debt was not deemed unconstitutional, and the enlargement of the person bound, the final exemption of the person of the debtor

from imprisonment, and a certain quantity of his property, essential to family comfort, and the staying of the judgment by giving security, have all been the exercise of a humane and enlightened legislative power applying to future contracts, and because of this latter provision have been very generally upheld as constitutional, as not "impairing the obligation of contracts," within the inhibition of the United States Constitution. But however efficient the remedies have been made, even when the property has been sold for cash on the judgment, or however speedy the remedy, these have been considered as sustaining the obligation of the contract, and not the exercise of absolute, arbitrary power.

To take from the citizen his property without just compensation paid or to be paid, even for public use, may justly be denounced as absolute, arbitrary power within the constitutional meaning; but not so when he is merely compelled by legal process to pay out of his property the money he may owe to others; all delays after the debts are due may be regarded as matters of grace on the part of the creditor or the government, especially when these delays are regulated by law.

We must then regard this enactment as valid, and this cause of attachment as made out.

But Beazley as against the attaching creditors is not precluded from showing irregularities in the issual of the attachments, particularly those that would vitiate them.

It is true his appearance removed the necessity, thereafter, of taking the refunding bonds provided by the Civil Code as against defendants constructively summoned, inasmuch as the creditors could then proceed to obtain their judgments *in personam,* but this would in no wise preclude him from setting up any irregularities in procuring the attachments and in defeating them in whole or in part for any legal cause existing previous to such appearance, as, thereby, he might obtain important rights to be redressed upon proper proceedings either against the attaching creditors or them and their executors.

But however defective may have been the warning orders, his first appeal to this court was a constructive appearance, and equivalent to an actual service at the filing of the mandate of the lower court, and the court should then have proceeded to try the several cases as upon actual service.

As the judgment of sale was reversed by this court on Beazley's appeal, and as no judgment *in personam* has since been rendered against him in favor of the various creditors, it was erroneous to regard said creditors' as having judgment and then rendering judgment in Beazley's favor for such sums as they asserted over and above what he owed them. Instead of such the court should have ascertained what he owed each, and then ordered it cancelled out of the funds received by them, and then ordered a return into court of the surplus, and then have paid this over to Beazley upon his application, as this would not bar him from prosecuting suit against such attaching creditors for the sacrifice which they may have unnecessarily caused him.

The judgment, therefore, of a return to him of $138.81 from G. F. Peacock, trustee of Thomas Peacock, as money overpaid on Wherritt's attachment, and the judgment for $769.18 against Lucy Beazley for overplus received by her, which W. H. Beazley did not owe her, were erroneous, as they might and probably would bar him from any further proceedings.

Joseph Robinson and John S. Gill were creditors of B. F. Beazley, deceased, and not of W. H. Beazley, but proceeded against the latter because he was the former's administrator, and had carried away some of his assets.

Whatever may have been the cause of attachment as to the administrator, no judgment should have been rendered until these creditors manifested, in proper form, their claims against the decedent's estate, for the heirs and distributees of the decedent were the substantial parties to be affected; no doubt but the creditors of a decedent under the provisions of the Code could attach the estate of an absconding administrator or one in the Confederate military service, as a provisional security, but this would not waive the necessity of manifesting their claims with all the necessary prerequisites against the decedent's estate, which these creditors have not done. There may have been sufficient assets of decedent left to pay all his debts, or, if not, there is no perceivable reason why his estate should be taxed with the costs of their attachments. As the case now appears, there is neither a personal judgment against the administrator, nor against him in his fiduciary character, yet his means are converted to the payment of these debts.

The judgments as to the other creditors are informal and novel,

being a dismissal of W. H. Beazley's petition and motions to dismiss their attachments without any judgment of sale save the reversed one, which is now no judgment. Yet as there is no cause shown against the justice of their claim or cause of their attachments, we cannot see how Beazley is injured by the informality.

As the judgment must be reversed alone as to Lucy Beazley and Wherritt and Peacock and Robinson and Gill, and affirmed as to the others, and as to these there may be other proceedings which like the past will be pending before the lower and this court at the same time, and as there should be a termination at some time of litigation between these parties, the court upon rule or otherwise should require the parties to consolidate all their proceedings or pending litigation, and adjust up all their present litigation in one consolidated judgment.

Wherefore, the judgment is reversed as to Lucy Beazley, Wherritt, Peacock, Robinson and Gill, with directions for further proceedings as herein indicated, and affirmed as to all the other appellees.

*Bradley,* for appellant.

*Anderson, Dunlap,* for appellees.